# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

### No. 24-8056
(Administratively consolidated with Nos. 24-8055 and 24-8057)

---

RETURN TO FREEDOM, FRONT RANGE EQUINE RESCUE, et al.,
Petitioners-Appellants,

v.

DEB HAALAND, Secretary, U.S. Department of Interior, et al.,
Respondents-Appellees,

and STATE OF WYOMING and ROCK SPRINGS GRAZING ASSOCIATION,
Respondents-Intervenors-Appellees

---

On Appeal from the United States District Court
for the District of Wyoming (Hon. Kelly H. Rankin)
Case Nos. 2:23-cv-84-KHR (Lead); 2:23-cv-87-KHR (Joined);
2:23-cv-117-KHR (Joined)

---

### PETITIONERS-APPELLANTS' PRELIMINARY REPLY BRIEF
Uncited Preliminary Reply Brief (Deferred Appendix Appeal)

---

Bruce A. Wagman
Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Tel: 415.275.8540 Fax: 415.275.8551
Email: bwagman@rshc-law.com
*Attorneys for Petitioners-Appellants*
*Return to Freedom, Front Range Equine Rescue, Meg*
*Frederick, and Angelique Rea*

Dated: January 14, 2025

### *Oral Argument Requested*

## TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................. 3

    I.    There Was No AML Analysis, in Violation of the WHA. ...... 3

    II.   RSGA's Revoked Consent Improperly Dictated and
           Preordained BLM's NEPA Conclusion. ................................. 8

    III.  BLM Did Not Duly Consider Reasonable Alternatives. ....... 15

    IV.  BLM's Litigation Reasons for Rejecting Reasonable
          Alternatives Do Not Withstand Scrutiny. ........................... 20

    V.   The Challenged Action Is Not Minimal Feasible
           Management and Violates the WHA. ................................. 25

    VI.  The RMPAs Mandate the Removal of the Wild Horses. ..... 27

    VII. BLM's Decision Record Does Not Demonstrate FLPMA
           Compliance. ........................................................................ 31

CONCLUSION ......................................................................... 32

CERTIFICATE OF COMPLIANCE ......................................... 34

CERTIFICATE OF SERVICE ................................................. 34

# TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*Am. Petroleum Inst. v. U.S. Dep't of Interior*,
   81 F.4th 1048 (10th Cir. 2023) ...................................................................7

*Am. Wild Horse Campaign v. Bernhardt*,
   442 F. Supp. 3d 127 (D.C. Cir. 2020), *aff'd sub nom. W. Watersheds
   Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021) ........................6, 26

*Am. Wild Horse Pres. Campaign v. Jewell*,
   847 F.3d 1174 (10th Cir. 2016)..................... 1, 2, 3, 4, 5, 9, 14, 22, 26, 27

*Colo. Envtl. Coal. v. Dombeck*,
   185 F.3d 1162 (10th Cir. 1999)..................................................................10

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002)..................................................................12

*Fallini v. Hodel*,
   783 F.2d 1343 (9th Cir. 1986)....................................................................22

*Forest Guardians v. U.S. Fish & Wildlife Serv.*,
   611 F.3d 692 (10th Cir. 2010)....................................................................21

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) .....................................................................27

*Habitat for Horses v. Salazar*,
   745 F. Supp. 2d 438 (S.D.N.Y. 2010) .......................................................26

*Metcalf v. Daley*,
   214 F.3d 1135 (9th Cir. 2000).....................................................................21

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
   565 F.3d 683 (10th Cir. 2009).....................................................................17

*Or. Nat. Desert Ass'n v. BLM*,
   625 F.3d 1092 (9th Cir. 2008).....................................................................16

*Save the Colo. v. Semonite,*
No. 18-CV-03258-CMA, 2024 WL 4519201 (D. Colo. Oct. 16, 2024) ....15, 19

*Simmons v. U.S. Army Corps of Eng'rs,*
120 F.3d 664 (7th Cir. 1997) ...................................................................16

*State of Cal. v. Block,*
690 F.2d 753 (9th Cir. 1982) ...................................................................17

*In re Syngenta AG MIR 162 Corn Litig.,*
61 F.4th 1126 (10th Cir. 2023) ................................................................7

*Tran v. Trs. of State Colls. in Colo.,*
355 F.3d 1263 (10th Cir. 2004) ...............................................................7

*United States v. Walker,*
918 F.3d 1134 (10th Cir. 2019) ...............................................................7

*W. Rangeland Conservation Ass'n v. Zinke,*
265 F. Supp. 3d 1267 (D. Utah 2017) ....................................................26

*W. Watersheds Project v. Vilsack,*
No. 23-8081, 2024 WL 4589758 (10th Cir. Oct. 28, 2024)............11, 12, 15, 18, 20, 21, 24, 25

## STATUTES

16 U.S.C. § 1333(a) ..................................................................................13

16 U.S.C. §§ 1333(a), (b)(1) .................................................................5, 26

Federal Land Policy and Management Act....................................1, 3, 4, 17, 19, 27, 28, 31, 32

National Environmental Policy Act................................... 1, 3, 8, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 23, 25, 32

Wild Free-Roaming Horses and Burros Act. .... 1, 3, 4,  9, 13, 14, 15, 19, 20, 22, 25, 26, 27, 31, 32

# GLOSSARY

| | |
|---|---|
| AML | Appropriate Management Level |
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| (F)EIS | (Final) Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FRER | Front Range Equine Rescue |
| HA | Herd Area |
| HMA | Herd Management Area |
| NEPA | National Environmental Policy Act |
| RMP(As) | Resource Management Plan (Amendments) |
| ROD | Record of Decision |
| RSGA | Rock Springs Grazing Association |
| RTF | Return to Freedom |
| WHA | Wild Free-Roaming Horses and Burros Act |

<u>INTRODUCTION</u>

This Court's *de novo* review should see through Appellees' strawman arguments and contradictions of the administrative record and hold that BLM's decision violates the WHA, NEPA, and FLPMA.

BLM says its decision was not preordained, but the record and briefs are replete with statements that BLM had to take the specific action that it actually did take to permanently satisfy RSGA's removal demands. Consideration of alternative actions was a box-checking exercise; alternatives were dismissed if they did not meet the narrow purpose of acceding to RSGA's demands and upholding BLM's acts of administrative convenience—but not statutory compliance—in avoiding the burdens of future Section 4 removal requests. BLM rejected alternatives that would have allowed horses to remain on public lands because those alternatives did not prevent horses from straying onto RSGA's lands, even though BLM has no such obligation, or authority, to prevent straying onto private lands.

Appellees all argue that this appeal is *not* related to *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174 (10th Cir. 2016) ("*Jewell*"), and all opposed Appellants' motion to assign this appeal to the same panel.

But at the same time, according to BLM, *Jewell* has already sanctioned and suggested the exact administrative action that BLM took in this case. That misreads and misstates the *Jewell* opinion, but it also shows how far afield of the administrative record Appellees are straying in an effort to defend BLM's decision.

The contradictions continue, with Appellees insisting that these wild horses are not being removed, even though the EIS says that BLM has made an "*irreversible and irretrievable commitment*" to remove them. Of course, BLM made such a commitment as a natural outgrowth of its reason for taking action in the first place. The *only* basis for BLM's decision to eliminate these wild horses from public lands is RSGA's revoked consent to allow wild horses to use its private lands. (RTF/FRER Prelim. Uncited Opening Brief, ECF No. 34 ("Open. Br."), at 37-38, 45.)

BLM retreats to several strawman premises, by arguing against a presumption that BLM must designate HMAs with no consideration of private lands and with no consideration of private landowner consent (Fed.-Appellees' Answering Br., ECF No. 48 ("Fed. Br."), at 45-46). No Appellant has made either of these contentions. Appellees' strategic choice to focus their briefing on responding to their articulation of

unconvincing arguments that Appellants *have not made* speaks to the merits of their position and what BLM is trying to defend.

The agency's action is irreconcilable with the minimal feasible management mandate. The action is irreconcilable with the requirement to determine wild horses to be excess and to be preventing achievement of a TNEB on the public lands *before* BLM can mandate their removal. The action was the result of an improper NEPA process. The action was taken without regard to FLPMA's mandates because the decision was a foregone conclusion. For all of these reasons and in accordance with the record evidence, the Court should vacate this unlawful action.

<u>ARGUMENT</u>

I.    <u>There Was No AML Analysis, in Violation of the WHA</u>.

BLM has violated the WHA and ignored the *Jewell* opinion in modifying AMLs through the RMPAs without following the required processes for doing so.

BLM is obligated to follow clear processes before making AML modifications. (Open. Br. at 49-55.) BLM recognized in the ROD that "[t]o evaluate and potentially adjust AML, the BLM [must] conduct and document the multitiered analysis process outlined in the [Handbook],"

including "in-depth review of intensive monitoring data." (AR001652.) RTF/FRER presented record citations, including to BLM's Handbook, and case law that underscore the processes that BLM was supposed to follow to establish or adjust AML. (Open. Br. at 49-52.) BLM did not do so.

Adjustments to AML are crucial metrics because they are almost always the primary if not exclusive basis upon which BLM justifies its removal actions to get wild horses off of public lands. (Open. Br. at 50.) Thus, there are weighty consequences that follow from the establishment or revision of an AML. The processes for establishing that population range as a matter of administrative law should not be tossed aside in order to serve other motives that ultimately lead to violations of law.

In describing BLM's "management obligations" in *Jewell*, this Court stated that when HMAs and their boundaries are established in RMPs pursuant to FLPMA, in order to comply with the "[WHA]'s directive to manage wild horses 'in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands,'" BLM must maintain current inventories, determine the AML that the HMA can sustain, and determine the method of achieving the AML. *See Jewell*, 847

F.3d at 1178 (citing 16 U.S.C. §§ 1333(a), (b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1). The Court went on to describe the AML's expression of a population range, where "'[t]he AML upper limit shall be established as the maximum number of [wild horses and burros] which results in a [thriving natural ecological balance] and avoids a deterioration of the range' at issue." *Id.* (quoting record).

As recognized by this Court in *Jewell*, the AML adjustment process requires evaluation of ecological conditions and a TNEB on the lands at issue. None of that analysis and evaluation was done in this case. Instead, the ROD is unequivocal that TNEB was not a factor in eliminating the HMAs, redrawing HMA boundaries, or revising their AMLs. (*See* Open. Br. at 31-32, 37-38.)

*None* of the Appellees disputes RTF/FRER's opening argument that BLM failed to conduct analyses to adjust AMLs, nor does any Appellee contend that such analyses—if BLM had undertaken them—were adequate or reasonable, based on record data, for maintaining a TNEB on public lands. (*See* Open. Br. at 49-55, 27-29.) In fact, BLM hardly mentions AML in its answering brief, except to recognize that AML was changed as part of the RMPAs. (Fed. Br. at 25, 71-72) (citing AR001193.) *See also* Wyoming

Appellee Brief, ECF No. 49 ("WY Br."), at 22-23, 34 (same); RSGA Appellee Brief, ECF No. 51 ("RSGA Br."), at 29-30 (stating that BLM's wild horse management to achieve and maintain a TNEB guides the AML).

BLM acknowledges that it "typically" considers TNEB before establishing the AML (Fed. Br. at 52), though it is indisputable that a TNEB was not considered in the decision challenged here. (*See*, *e.g.*, Open. Br. at 15.)

Furthermore, BLM makes no claim that it could not have considered TNEB before revising the AML for these HMAs. The record's evidence is that BLM did not consider a TNEB in the context of reducing these HMAs' AMLs, because a TNEB already existed on these lands. (*Id.*) Thus, by implication, the TNEB statutory framework would not have backstopped BLM's decision to shrink these wild horse herds' populations.

BLM's citation to *Bernhardt* (Fed. Br. at 50) is countervailing to the agency's argument because that case reflected that BLM based its changes to AML (in the process of converting from an HMA to an HA, no less) on current rangeland conditions, *i.e.*, it was a clear factor with respect to BLM's management of the horses. *See Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 139-157 (D.C. Cir.2020), *aff'd sub nom. W.*

*Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021); Open. Br. at 54.  Contrary to BLM's contention (Fed. Br. at 51), this structure and precedent are consistent with BLM's statutory obligations to determine AML for a TNEB and only to find "excess" wild horses sufficient to mandate their removal when a TNEB is lacking.

BLM was granted leave to file an oversized appellate brief "in order to adequately address the many, often nonoverlapping, issues presented in the opening briefs." (ECF No. 47.) There is no excuse for failing to respond to RTF/FRER's opening arguments regarding BLM's improper changes to AML.  The Appellees have waived their arguments on this issue by not briefing them.  *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1181 (10th Cir. 2023); *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019); *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004).

The Court should find BLM's changes to AML in these revised HMAs and through conversions to HAs are arbitrary and capricious because the changes do not conform to statutory mandates, do not follow the processes in BLM's Handbook, and are "not supported by substantial evidence in the [administrative] record." *Am. Petroleum Inst. v. U.S. Dep't of Interior*, 81

F.4th 1048, 1058 (10th Cir. 2023) (alterations in original) (internal quotation marks omitted).

## II. RSGA's Revoked Consent Improperly Dictated and Preordained BLM's NEPA Conclusion.

There was only one reason and one purpose for the RMPAs: satisfying RSGA's Section 4 removal demand.  There was no consideration of the level of management of these wild horses, of the TNEB on these public lands, or of ecological conditions more generally.  "The purpose and need for this amendment was *not* triggered by concerns regarding existing resource conditions within these HMAs. . . .  [T]his document does not focus on whether existing range conditions reflect a TNEB[.]" (AR001653-54.)

The record establishes that BLM decided—and acted accordingly— that it wanted to reach the outcome first devised by BLM and RSGA in their Consent Decree.  (*See* AR059062-63 (stating management action would benefit both parties to the Consent Decree); AR001543 (describing intent to "meet[] the requirements of the Consent Decree".))  RSGA's briefing confirms that (in BLM's and RSGA's opinions) the fix was in from the start: "When RSGA revoked its consent, the BLM *had no choice but to* change the HMAs and convert the Checkerboard and adjacent public lands to Herd Areas." (RSGA Br. at 6 (emphasis added).)  "To effectuate its mandatory

duties under Section 4, the *BLM was required to* remove wild horses from RSGA's private lands and amend the RMP to adjust the HMA boundaries to exclude the Checkerboards lands from the HMAs." (RSGA Br. at 35 (emphasis added.))

The agency considers it an "extraordinary claim" that BLM predetermined the outcome of its planning process. (Fed. Br. at 36-37.) This hyperbole follows pages of BLM justifying its decision by saying the opinion in *Jewell* supports the agency's decision, as BLM stresses that it needed to take this action and must take this action because of Section 4 of the WHA, and that this Court in *Jewell* sanctioned its action. (Fed. Br. at 4, 35, 58-59.)[1] If the *only* solution to RSGA's revoked consent is eliminating multiple HMAs on public lands in their entirety, then Appellees' logic would seem to dictate that BLM's conclusion was

---

[1] Appellees simultaneously seek to justify BLM's action as a path recommended by this Court in *Jewell* (Fed. Br. at 23-24, 35, 58-60; WY Br. at 5; RSGA Br. at 20-21, 33, 35), while also arguing that this current appeal is *not related* to *Jewell*. (Fed. Br. at xi, (stating *Jewell* "did not address the . . . same legal issues"); WY Br. at viii (stating this appeal "deals with separate legal questions" from *Jewell*; RSGA Br. at ix (same).) Irony aside, the *Jewell* opinion did not recommend or suggest that any HMAs should or could be wholly eliminated to meet RSGA's removal demands.

effectively determined as soon as RSGA's consent was revoked. And that constitutes a clear violation of NEPA's requirements.

BLM's purpose and need for the project from the start has been unduly narrowed, to satisfy RGSA's business desires, its revoked consent, and its demands to remove wild horse to serve the economic demands of private parties. An agency cannot define its objectives in unreasonably narrow terms. *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999) (providing that "the statements of purpose and need drafted to guide the environmental review process" may not be "unreasonably narrow"); *see also* Open. Br. at 44-45. The predetermined outcome of the RMPAs in this case was driven by the telescopic focus BLM put on the purpose and need to bend to RSGA's demands.

Furthermore, because BLM wanted to avoid any need to continuously respond to RSGA's Section 4 removal demands, BLM decided to lump together large contiguous blocks of public lands with adjacent Checkerboard lands and treat them as one when evaluating whether wild horses could remain on the lands. If wild horses could not remain on the Checkerboard, they could not remain on the nearby solid-block public lands. The reason? BLM did not want to be called repeatedly to remove straying

horses from RSGA's private lands.  As BLM's briefing makes clear, preventing straying and avoiding burdens of constant removals from RSGA's lands were a driving motivation.  (Fed. Br. at 4, 28-31, 54, 80.) *Nothing* in the law permits such a decision.

BLM was determined to find and approve of one solution: converting the vast majority of land in all of the HMAs to HAs and removing most of the wild horses.  In turn, BLM defined the need for its RMPAs very narrowly.  It was not responding to ecological needs.  (*E.g.*, AR001203, AR001228; Open. Br. at 15-16.)  It was not striking a TNEB on public lands.  (Open. Br. at 15-17, 36-37.)  It was responding just to RSGA's revoked consent.  (Open. Br. at 43-45.)

The Tenth Circuit has very recently considered a similar issue and concluded that the agency violated NEPA by issuing "an unduly narrow Purpose and Need statement, fail[ing] to consider a reasonable range of alternatives, and fail[ing] to take the requisite 'hard look'" at the consequences of its plan amendment.  *W. Watersheds Project v. Vilsack*, No. 23-8081, 2024 WL 4589758 ("*WWP v. Vilsack*"), at *1 (10th Cir. Oct. 28, 2024).

In *WWP v. Vilsack*, the lands at issue were similarly under a combination of management authorities in a "non-contiguous" ownership pattern, with roughly half a million acres of federally managed public lands adjoined with over a million acres managed either by the State of Wyoming or privately. *Id.* Also, not unlike this situation involving federally protected wild horses, the *WWP v. Vilsack* dispute involved the lands' designation as habitat for a prairie dog species that was federally protected, yet local authorities at once considered the species to be both an "agricultural pest" as well as a species of "greatest conservation need," "which ma[de] [its] management [ ] a complicated task." *Id*.

This Court in *WWP v. Vilsack* held that a statement of project objectives was unreasonably narrow in violation of NEPA where it effectively permitted the selection of only one project outcome, particularly where the record suggested potentially viable alternatives, but the purpose and need statement "mandated" a single result. *Id.* at *6 (citing *Davis v. Mineta*, 302 F.3d 1104, 1119–20 (10th Cir. 2002)). Specifically, the Court ruled in favor of conservation groups' arguments that the agency's purpose and need violated NEPA because it "narrowly focuse[d] on increasing lethal [species] controls without considering

whether doing so [wa]s a sound idea" and failed to acknowledge the agency's concurrent duty to *protect* an endangered species that would be directly impacted by decreasing the targeted species population. *Id.* at *7.

The Tenth Circuit faulted the agency for merely acknowledging the agency's responsibilities to contribute to the recovery of the endangered species but then proceeding to define the needs of its plan amendment narrowly to "increase the availability of lethal [ ] control tools," and limiting its "consideration of alternatives to those that would increase lethal [ ] controls." *Id.* Having acknowledged its broader and varied management responsibilities, the purpose and need statement at issue was legally insufficient, when it was drawn up in spite of or in disregard of those broader statutory responsibilities.

Applying the same principles here, BLM cannot dispute its duties to protect wild horses and engage in minimal feasible management of them under the WHA, including in adopting these RMPAs. *See* 16 U.S.C. § 1333(a) (all management actions shall be at the "minimal feasible level of management"); Open. Br. at 32-35; AR001178, *et seq.*; AR001656, *et seq.* However, the RMPAs and alternatives discussed in the FEIS do not

accord with those responsibilities and instead narrowly focus exclusively on the need to respond to RSGA's withdrawn consent with respect to private lands and the agency's desire to avoid future Section 4 removal requests. (AR001634; Open Br. at 37-38, 45.)

This Court's prior opinion already warned BLM that it has no "authority to construe the [WHA] in a manner contrary to its plain and unambiguous terms." *Jewell*, 847 F.3d at 1188. Failing to incorporate the WHA's management mandates into the purpose and need of the RMPAs taints the environmental review process, violating NEPA and the APA.

During project review, public commenters also reminded BLM that it was obligated to manage wild horses at "minimal feasible" levels. BLM responded by admitting its violation of NEPA and the WHA, stating that "the Purpose and Need [ ] for this action is based on the . . . removal of private landowner consent, and is not based on current resource conditions on these HMAs." (AR001411; AR001418; AR001509; AR001532-33; AR001629-30.) This response from the agency fails to explain how or why the preferred action alternative satisfies the statutory mandate for "minimal feasible management" (because it does

not, and cannot) and suggests the agency saw fit to bypass that mandate rather than incorporate it in the RMPAs.

The record is unequivocal that BLM was not acting in accord with its WHA mandates to engage in minimal feasible management of wild horses, is not removing wild horses to restore a TNEB to public lands, and has decided to adjust AML without sound data and without regard for a TNEB. (Open. Br. at 23-55.) Instead, BLM was ignoring those statutorily-mandated duties toward the foregone conclusion that would best suit the needs of the agency and RSGA to rid most of the wild horses permanently from both public and private lands. Such a narrowly focused project purpose was improper and alone is grounds for vacating the challenged decision.

## III.   BLM Did Not Duly Consider Reasonable Alternatives.

An unreasonably narrow project purpose under NEPA limits the range of reasonable alternatives considered in the EIS. As in this case, such a contrived purpose effectively excludes viable alternatives from consideration, making the EIS's end result a mere formality rather than a genuine analysis of alternative project options. *See WWP v. Vilsack*, at *8; *Save the Colo. v. Semonite*, No. 18-CV-03258-CMA, 2024 WL

4519201, at *30–31 (D. Colo. Oct. 16, 2024) (noting the agency's "unduly narrow purpose-and-need statement" led to "exclud[ing] from further consideration multiple alternatives" where the agency instead focused on accommodating the applicant's project preferences); *see also Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997) (noting that "one obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)").

It is uncontroversial that "the statutory objectives underlying the agency's action work significantly to define its analytical obligations" under NEPA. *See Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1109 (9th Cir. 2008). Thus, "the factors to be considered are derived from the statute the major federal action is implementing." *Id.* at 1109 n.11.

In the *Or. Nat. Desert* case, the court found a NEPA violation from the agency's RMP approval of off-road vehicle use areas, which plan approval "constitute[d] formal designation" of its selected action with "immediate and sweeping" effects, where the agency failed to consider alternatives of not opening land at all and of closing more than a fraction of the land to such use. *Id.* at 1123. The court admonished that the lack

of consideration for those alternatives is "precisely this sort of uncritical privileging of one form of use over another that we have held violates NEPA." *Id.* at 1123–24 (internal quotation omitted). *See also State of Cal. v. Block*, 690 F.2d 753, 767–68 (9th Cir. 1982) (agency violated NEPA where it uncritically assumed that a substantial portion (at least two-thirds) of the management area should be developed and only considered alternatives in its EIS "with that end result").

Courts in this Circuit are in accord. *See, e.g., New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 709-711 (10th Cir. 2009) (BLM violated NEPA in planning to open 97% of land to mineral development and eliminating plan that closed more land to development, given BLM's multiple-use mandate and prohibition on undue degradation under FLPMA).

This Court recently reaffirmed that a NEPA violation occurs when an agency fails "to provide legitimate consideration to alternatives that fall between the obvious extremes." *WWP v. Vilsack*, at *9 (internal quotation omitted). There, in particular, the Court noted:

> The USFS briefly acknowledges in the FEIS that it considered but declined to work up an alternative which would expand prairie dog acreage objectives. However, it states only that "[t]his suggestion *was not analyzed in detail because an increase in the acreage*

*objective for prairie dog colonies would not meet the purpose and need for the plan amendment.*" [. . .] [T]he USFS offered no explanation as to why increasing the acreage objective for prairie dog colonies would not meet the stated purpose of "continued conservation of at-risk species."

*Id.* at *10 (emphasis added).

Similarly, here, BLM quickly disposed of any compromise or alternative middle ground to removing all of the wild horses from the Checkerboard and from most of the adjacent public lands, too. And BLM was not writing on a blank page for these HMAs. (Fed. Br. at 42.) Having determined decades ago that vast sections of public lands were suitable for a TNEB with sizeable wild horse populations, BLM had to have some factual reason, based on public lands-resources and not mere administrative convenience, for eliminating those lands from administration for wild horses. But the alternative process for this action (Fed. Br. at 72-73, 75-76) was a sham because BLM rejected anything that did not prevent future straying of any wild horses onto RSGA's private lands.

The *Semonite* case presents another analogous situation to this matter. There, the agency "considered" several alternatives but ruled them out as incompatible with the improperly narrow purpose and need

statement, designed to suit the demands of a private party. As that court noted,

> [T]he Corps "considered" these alternatives [of constructing or expanding other reservoirs, and water transfer, recycling, or storage] in a merely colloquial sense, but NEPA requires "hard look" consideration of seemingly practicable alternatives and, here, *the Corps excluded all of the aforementioned possibilities simply because they could not meet all of Denver Water's demands*.

*Semonite*, 2024 WL 4519201, at *31 (emphasis added). The same reasoning should apply here. BLM gave short shrift to proposals that would not *permanently* satisfy RSGA's removal demands, at the expense of public lands, the WHA, and FLPMA.

BLM owns well over half the land (68 percent) in the planning area and has not explained, and cannot justify, why it is acting like most of those lands are no longer suitable for any wild horses. (AR001227; AR001316; Open. Br. at 31-35.) BLM has not demonstrated why those lands should not have been given ample consideration as alternatives for the project planning area, consistent with the *stated* purpose and need to "identify and select, *consistent with applicable law*, a plan for wild horse management, including AML, on the current HMAs that include Checkerboard land." (AR001193 (emphasis added).)

19

By failing to consider alternatives that fulfilled BLM's multiple use mandate on public lands and wild horse protection and preservation obligations under the WHA, BLM's NEPA analysis failed. (AR001228; AR001245; AR001285; Open. Br. at 56-62.)

## IV.  BLM's Litigation Reasons for Rejecting Reasonable Alternatives Do Not Withstand Scrutiny.

In *WWP v. Vilsack*, this Court rejected the agency's "reasons" supplied for not truly considering alternatives, where the agency pointed to superficial justifications for its preferred action. The Court looked at the substance and context and did not accept the agency's poorly founded explanations at face value where further record evidence undercut the agency's position for rejecting reasonable alternatives. *See id.* at *7 (rejecting agency's explanations that "nonlethal control methods such as translocation and vegetation barriers were inefficient and costly, local communities were resistant to them, and they were 'impractical to prevent encroachment on sufficient scales.'")

This appropriate scrutiny aligns with courts' recognition that they "cannot be confident that, in every instance, the bias will be evident from the NEPA analysis," and thus, preordained outcomes may be found "irrespective of the facial regularity of the agency's NEPA analysis."

*Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 717 (10th Cir. 2010) (citing *Metcalf v. Daley*, 214 F.3d 1135, 1144 (9th Cir. 2000)).

The Court should apply such scrutiny to BLM's alternatives analyses and rationales here, too.[2]    Indeed, similar superficial justifications for not considering less harmful actions in *WWP v. Vilsack* are also at issue with respect to the wild horses in this case.

As one example, BLM rejected the burdens associated with an alternative of allowing wild horses to stay on solid-block public lands due to concerns about preventing roaming onto RSGA's private lands. (AR001203; AR001205; AR001250; AR001675; AR001677; AR001678.) Appellees emphasize that BLM reasonably considered the alternative of allowing wild horses to remain on the solid-block portions of the former HMAs and reasonably rejected that alternative because the wild horses could not be prevented from straying onto RSGA's lands and thus, a fence or barrier would need to be constructed, which would have negative consequences. (Fed. Br. at 4, 28-31, 54, 63, 80; WY Br. at 12, 15-16, 21.)

---

[2] RTF/FRER incorporate by reference the arguments and briefing of Appellants AWHC with respect to the land exchange alternative that BLM rejected. (*See* AWHC Prelim. Open. Br., ECF No. 28, at 51-55; AWHC Prelim. Reply at 22-27.)

There are two fundamental flaws in Appellees' position. First, the agency has no duty to prevent wild horses from straying onto RSGA's lands. This principle is both long established and known to BLM. The WHA "does not require . . . BLM to prevent straying [of wild horses from public lands to private lands] in the first instance," and the "[p]revention of straying [is] subservient to the [Act's] *fundamental goal of protecting* the animals with *minimal management* effort." *Fallini v. Hodel*, 783 F.2d 1343, 1345-46 (9th Cir. 1986) (emphases added); *Jewell*, 847 F.3d at 1189 (citing *Fallini* in rejecting BLM's action that "was effectively attempting to stop wild horses from straying from the public land sections of the Checkerboard to the private land sections of the Checkerboard").

Thus, BLM's decision-making was arbitrary and capricious where it rejected solid-block lands as HMAs on the basis of a duty that BLM does not have and that serves only private interests. (AR001203 (discussing that BLM needed to "prevent" the wild horses "from drifting out of the solid-block portions" of the HMAs and "it would be very difficult for BLM to prevent this herd from continually returning to private lands"); AR001205 ("In order to prevent wild horses from straying onto private land within the Checkerboard . . .").)

22

Second, the record of decision is at best unclear on the issue of fencing concerns as a reason for eliminating the solid-block public lands-alternative. As highlighted below, the administrative record contradicts Appellees' litigation position, which suggests that BLM may have contrived a reason to reject the alternative of maintaining solid-block public lands as HMAs, before truly exploring and taking a hard look at the possibility.

While Appellees argue in briefing that BLM ruled out public lands-as-HMAs due to fencing issues, (Fed. Br. at 28-31, 63; WY Br. at 15-16), the record of decision says otherwise. Public commenters observed that "[t]he potential of introducing a barrier between Checkerboard lands and solid-block lands was insufficiently explored" in its NEPA analysis. BLM responded directly that

> [n]one of the alternatives in this EIS directly propose the installation of fences or other barriers. . . . Alternative B recognizes that fences or other barriers *may* be needed to manage wild horses under that alternative, but it does not specify that fences will be used.

AR001589 (emphasis added). Appellees cannot now argue that the option of barriers was thoroughly explored and rejected because the decision record makes clear that such option *was not given serious consideration*,

and certainly was not explored at any level of detail. It was raised but never given a hard look. BLM did not duly consider this alternative to its preferred project outcome.

In *WWP v. Vilsack*, the agency argued that it was struggling to manage the populations under the existing management strategy because it could not respond to rapid changes in the population. *Id.* at *7. Similarly, here, BLM preferred to remove most wild horses from these public lands to avoid being overburdened with future Section 4 removal requests from RSGA and improperly made that preference the basis for its decision. (AR001634; AR001388; AR001407-08; AR001411; AR001193; AR001425; AR001205.) The Court should not countenance the rejection of alternative—and potentially less invasive—actions on such grounds.

Again, in *WWP v. Vilsack*, the Tenth Circuit concluded that given the agency's overarching objectives

> of both honoring its multiple-use mandate and its responsibility [toward the protected species], its Purpose and Need statement—which narrowly directed [the agency] to consider only action alternatives that expanded the use of lethal controls—precluded a reasonable consideration of alternatives and thus violates NEPA.

*Id.* at *8.

24

Here, BLM stated that it did not consider "whether existing range conditions reflect a TNEB as described in the [WHA], or whether the wild horses are 'excess' horses that must be removed from the range" because its analysis responded exclusively to the "change in consent for the use of private lands within the [C]heckerboard portion of these HMAs." (AR001634; AR001411.)   Its action responds only to that change. AR001190.   *See also* AR001407-08, -16-17, AR001388.

By not incorporating its WHA mandates into its considered alternatives and preferred action, and not giving a critical hard look to those alternatives during the administrative process, in accordance with statute and the multiple precedents cited above, BLM violated NEPA.

## V.   The Challenged Action Is Not Minimal Feasible Management and Violates the WHA.

BLM argues that these RMPAs need not be "minimal feasible management" as required by the WHA because they are not management activities.  (Fed. Br. at 57.)  Preceding this assertion are pages of briefing outlining how the RMPAs embody BLM's decision to "*manage*" these wild horses in some areas and not in others.  (Fed. Br. at 3, 9-10, 25, 27, 29.)

Even if BLM's self-contradicting argument were countenanced, RTF/FRER are aware of no case upholding a BLM decision affecting wild

horses (such as amending HMA boundaries, converting HMAs to HAs, and

changing AMLs, *all* of which undisputedly occur under the RMPAs) that

did not comply with the WHA.

Indeed, while RSGA cites several cases for the proposition that courts

have recognized "BLM's authority to establish specific HMAs and HAs

through an RMP process," (RSGA Br. at 29), *all* of those cited decisions

factor in BLM's WHA management obligations, including the requirements

"to protect wild horse and burro populations," to "achieve and maintain a

thriving natural ecological balance[,]" and to "harmoniz[e] the protection of

wild horses and burros *and* the preservation of other rangeland values and

uses." *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267,

1274 (D. Utah 2017) (emphasis added). *See also* 16 U.S.C. §§ 1333(a), (b)(1);

*Jewell*, 847 F.3d at 1178-79; *Bernhardt*, 442 F. Supp. 3d at 139-41; *Habitat*

*for Horses v. Salazar*, 745 F. Supp. 2d 438, 451 (S.D.N.Y. 2010); *Fund for*

*Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 15-16 (D.C. Cir.

2006).

Even though the HMA amendments are occurring through an RMP amendment process pursuant to FLPMA,[3] the RMP amendment process cannot override BLM's WHA obligations, as this Court recognized in *Jewell*. There, BLM argued it did not need to consider AMLs under FLPMA when conducting a Section 4 removal.  The Court rejected that position and held that FLPMA and WHA obligations attached to BLM's actions affecting public lands, even if they were conceived as Section 4 removals at the behest of RSGA.  *Jewell*, 847 F.3d at 1190. The argument should be rejected, if not foreclosed, here again.

BLM's failure to ensure and demonstrate that the RMPAs are the minimal feasible level of management of the wild horses should lead the Court to vacate the agency's decision.

## VI.    The RMPAs Mandate the Removal of the Wild Horses.

BLM argues against its own decision record when stressing that the wild horses will not be removed under the RMPAs because the challenged action is merely a final decision about wild horse management, not (yet) the

---

[3] Here, RTF/FRER do not challenge as unlawful the RMP amendment process invoked to modify the HMAs.  BLM's legal faults arise in the specifics of the processes (not) followed and in the resulting violations of applicable statutes and regulations.

removal. However, such a position cannot be squared with the agency's concession, and the FLPMA mandate, that the wild horses *must* be removed under and according to the governing RMP. (*See* Open. Br. at 23-30.) To the extent BLM relies on word choice, its argument can be distilled down to whether the Court calls the RMPA a removal action, whereas RTF/FRER have maintained that the RMPA is a removal *mandate*, which BLM has already begun to implement. (Open Br. at 17, n. 3.)

As the FEIS reflects, the agency acknowledges "[t]he irreversible and irretrievable loss of wild horses from these HMAs [a]s discussed in Section 4.3 of the EIS." (AR001403; *see also* AR001603.) BLM specifically states that the "*irreversible and irretrievable commitment of resources*" at issue in its preferred Alternative D is to "permanently remove all wild horses from multiple HMAs." (AR001286 (emphasis added).)

Appellees' argument hinges on their attempts to sever the land use plan and its implementation, asking the Court to suspend consideration of the plan's effects. The land use plan that RTF/FRER challenge, the RMPAs, says in bold text that BLM has made an "**Irreversible and Irretrievable Commitment of Resources**[,]" defined as a commitment "that cannot be reversed," by selecting Alternative D and removing thousands of

wild horses from public lands. (AR001311.) Arguments about ripeness of RTF/FRER's wild horse removal mandate crumble against the unequivocal administrative record, and Appellees should not be permitted to contradict those record assertions in their litigation arguments.

Wordsmithing also should be secondary to the practicalities of how BLM implements the RMPAs. BLM has already posited that its forthcoming wild horse removal is authorized by the RMPAs. BLM is claiming that the horses are "excess" because the RMPAs eliminated several HMAs in favor of HAs and reduced the AMLs across the board. In other words, BLM is saying that its RMPA decision has usurped the statutorily mandated "excess" question and made that process superfluous or irrelevant by virtue of elimination of the HMAs now. That proxy is improper. BLM has collapsed the two inquiries by its action, which is impermissible. Consequently, there has not been any meaningful "excess" determination and, if BLM is allowed to go forward, there will not and cannot be any meaningful "excess" examination at a future date.

Allowing BLM to defer the "excess" inquiry until a later time is just a façade or record-making exercise. No actual inquiry about whether the

horses are "excess" can be undertaken, because the RMPA has already made that determination.

Aside from flatly contradicting the decision record, BLM should not be heard to argue that the RMPA is not a removal mandate while pressing its contention that it must take this action because of its Section 4 *removal* obligations toward RSGA. The agency even tells this Court that it focused only on "near-term" solutions to amending the RMPs (thus throwing out the land exchange alternative) "consistent with Section 4's requirements that the agency *remove wild horses as soon as practicable.*" (Fed Br. at 77 (emphasis added).) RSGA says the same thing: "The RMP revision was an appropriate and necessary action to . . . *remove unwanted wild horses from private lands pursuant to Section 4.*" (RSGA Br. at 6 (emphasis added.) *See also* WY Br. at 21 (noting RMPAs were triggered by the "non-discretionary" Section 4 removal obligation).

The Court should not buy the fiction that wild horses may not be removed when it is a *fait accompli* that they will; BLM's final decision and already-announced implementation demonstrate unequivocally otherwise.

## VII. BLM's Decision Record Does Not Demonstrate FLPMA Compliance.

The pretense that BLM has "delicate[ly] balance[d]" multiple uses on public lands by eliminating thousands of the wild horses from those public lands insults the intelligence of the Court and the public. (Fed. Br. at 42-43.) For years, wild horses have thrived and—critically—have *not* impacted the TNEB on public lands. The record is clear on this. (Open. Br. at 15-16.)

RTF/FRER have *never* argued and need *not* establish BLM's strawman argument that these public lands should be managed for the "maximum protection of wild horses." (Fed. Br. at 56). Instead, RTF/FRER have argued that eliminating the herds entirely, on a vacuous record in regard to the environmental reasons for doing so, violates both FLPMA multiple-use and WHA minimal feasible management mandates.

Appellees' FLPMA proof cannot be made in briefs and is nowhere in the record; the agency must have administrative record support that substantiates an about-face of its decision of how to use and administer vast public lands. RTF/FRER maintain that BLM does not have that record. All that BLM has is its repeated explicit admission that the *only* basis for its action is RSGA's revoked consent. (Open. Br. at 45, 51, 56.) Contrary to

the briefing, BLM did not claim to "seek a balanced solution" for "wildlife, vegetation, and water" (WY Br. at 33) because there was already a TNEB on the public lands.

The agency's claim in litigation that it can simply decide that some areas are "not appropriate for wild horses now" (Fed. Br. at 43.), based on the demands of a private party holding land thousands of acres away, would render meaningless FLPMA, WHA, *and* NEPA laws that mandate consideration of the protection of the public's natural resources. This Court should require BLM to make a record that attempts to explain how removing all of the wild horses from *over 1.2 million acres* of BLM-managed public lands comports with FLPMA's multiple use mandate and is a minimal feasible level of management. (AR001228.)

## CONCLUSION

For these reasons, RTF/FRER request that the Court vacate the decision as arbitrary, capricious, and not in accordance with law.

Respectfully submitted this 14th day of January 2025.

/s/ *Bruce A. Wagman*
Bruce A. Wagman
Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Tel: 415.275.8540
Fax: 415.275.8551
Email: bwagman@rshc-law.com
*Attorneys for Petitioners-Appellants*
*Return to Freedom, Front Range*
*Equine Rescue, Meg Frederick, and*
*Angelique Rea*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,427 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point size font.

## CERTIFICATE OF SERVICE

I certify that on January 14, 2025, I filed through the United States Appellate Court ECF System the foregoing document to be served by CM/ECF electronic filing on each counsel of record.

*/s/ Bruce A. Wagman*
BRUCE A. WAGMAN
Riley Safer Holmes & Cancila LLP

*Attorneys for Petitioners-Appellants Return to Freedom, Front Range Equine Rescue, Meg Frederick, and Angelique Rea*